**KALLE & CO. et al. v. MULTAZO CO., Inc., et al.**

**No. 2760.**

District Court, W. D. Michigan, S. D.

Aug. 12, 1937.

Harness, Dickey, Pierce & Hann, of Detroit, Mich., for plaintiff.

Chappell, Earl & Chappell, of Kalamazoo, Mich., for defendants.

RAYMOND, District Judge.

The bill of complaint charges defendants with infringement of patents owned by plaintiff, Kalle & Company, which has granted exclusive license thereunder to the plaintiff, Ozalid Corporation, Inc., to make and sell photo print paper and to practice the processes covered by U. S. patents No. 1,628,279 and No. 1,803,906. The first patent was granted May 10, 1927, upon application of Schmidt and Krieger, filed June 19, 1925, and the second was granted May 5, 1931, upon application of Krieger and Zahn, filed February 6, 1929. The first patent was granted for alleged improvements in the process and products covered by U. S. patent No. 1,444,469, issued February 6, 1923, upon application of Kogel and Neuenhaus, filed September 12, 1922. For brevity, these patents will be referred to by the first two digits of their respective numbers, the Kogel and Neuenhaus patent as "14", the Schmidt and Krieger as "16" and the Krieger and Zahn as "18".

The plaintiff, Kalle & Company, is a German corporation, and the co-plaintiff, Ozalid Corporation, Inc., is a Delaware corporation. The defendant, The Multazo Company, Inc., is a Michigan corporation. Issues relating to individual defendants and those arising out of counterclaim for unfair competition were eliminated prior to hearing by agreement of counsel. The remaining issues are the usual ones relating to validity and infringement.

Process claims 1 and 2 and product claims 4 and 7 of the "16" patent are in suit. They are:

"1. Process for producing sensitive layers on a suitable base, consisting in covering the base with a diazo compound being formed from amino compounds containing at least one other amino group and an azo dyestuff component.

"2. Process for producing sensitive layers on a suitable base, consisting in covering the base with a diazo compound being formed from amino compounds containing at least one other amino group, an azo dyestuff component and a metal salt.

"4. As new products, sensitive layers on a suitable base, consisting of diazo compounds being formed from amino compounds containing at least one other amino group, and an azo-dyestuff component.

"7. As new products, sensitive layers on a suitable base, consisting of diazo compounds being formed from amino compounds containing at least one other amino group, an azo dyestuff component and a metal salt."

All nine claims of the "18" patent are in suit, claims 1 and 9 being typical of the process and product claims thereof. These read:

"1. The process of stabilizing diazotypes which consists in adding to the light-sensitive layer a derivative of thiocarbonic acid.

"9. As new products, diazo-types containing thiourea, being of a great fastness to light."

The patents in suit relate to the production of a class of light-sensitive papers used in photo printing or printing by light, known as diazo type, in contradistinction to the methods used in production of blue prints or Van Dyke prints, the diazo type paper being distinguished by the fact that by its use positive copies of tracings or drawings are produced directly from the positive original, eliminating the step of making a negative which is used to produce the positive by means of a developer.

Diazo type papers are covered upon one surface with a light-sensitive coating consisting principally of two chemical compounds or components, one known as the diazo compound or component, and the other as the azo dyestuff component or coupling component. These two compounds are dissolved in an acid medium and the liquid solution is then applied to a surface of the paper and dried thereon.

The diazo compound possesses the property of coupling or combining with the azo dyestuff component. The azo dyestuff component upon such coupling forms a permanent color known as an azo dyestuff which reproduces in color the lines of the original. Diazo compounds also have the property of decomposing upon exposure to light giving off nitrogen in form of gas and leaving a residue which is incapable of coupling with the azo dyestuff component to form the permanent color.

These two properties of the diazo compound, namely, that of coupling with the azo dyestuff component and that of decomposing where exposed to light are utilized to produce a positive copy as follows: the

original to be copied is superimposed upon the coated surface of diazo type paper, a strong light is projected through the original and upon the coated surface, and the diazo compound decomposes where exposed to the light and remains undecomposed where protected by the opaque lines of the original; the decomposed portions are then incapable of coupling with the azo dyestuff component and these portions provide the uncolored background of the completed print; the undecomposed portion of the light-sensitive surface of the paper is then brought into contact with an alkaline medium such as ammonia gas and another chemical reaction takes place in which the undecomposed diazo component combines with the azo dyestuff component to form a fixed color. The result is a copy of the original lines in color upon a light background.

An important factor in the production of photo prints by means of two component light-sensitive papers is the prevention of premature coupling of the components after manufacture and during storage prior to use. This coupling readily takes place in an alkaline medium. It will not take place in a sufficiently acid medium, and the "14" patent recognized that color stability of the light-sensitive layer could be obtained by additions of acid such as tartaric or citric.

The two component papers are an improvement upon prior known one component papers in which the diazo compound alone is contained in the light-sensitive coating prior to exposure. In the one component paper, after exposure to light the coated surface is brought into contact with an alkaline developing solution containing the azo dyestuff component which then combines with the undecomposed portion of the diazo compound to form the fixed color. An important objection to one component papers is the necessity for application of the developer containing the azo dyestuff component in liquid form which wets the surface of the paper and causes distortions. The two component papers may be developed by means of gas such as ammonia gas, thereby preventing distortions.

The "16" patent recognizes that both one component and two component diazo type papers and prints are old. This patent is directed to an improvement in such papers, and particularly to the manufacture of two component positive print papers with a certain class of diazo compounds in the light-sensitive coating. The patent recites extensively the alleged teachings of the "14" patent which also belongs to plaintiff Kalle & Company. The "16" patent is claimed by plaintiff to disclose an improvement in that it teaches that two component papers can be made with a class of diazo compounds not disclosed in the prior art. Denial of this claim by defendant presents the principal issues here involved.

The "14" patent clearly taught that in both one and two component papers the light-sensitive layers could be produced by means of the so-called diazo-anhydrides and that diazo compounds could be applied simultaneously with azo dyestuff components without impairing the effect of the picture to be produced. It disclosed that diazo-anhydrides were particularly suitable for the production of such papers because they possess a high degree of light sensitivity and also because of their stability against decomposing during the time elapsing between manufacture and ultimate use. It further taught that this stability of the diazo-anhydrides and the azo dyestuff component against premature coupling could be increased by the addition of acid such as tartaric or citric to the coating solution. The "16" patent describes the alleged discovery of the inventors as follows:

"In U. S. Patent No. 1,444,469 it is set out that diazo compounds can be applied on the base simultaneously with the azo-dyestuff components, without impairing thereby the effect of the picture to be produced.

"Further it has been shown that the coupling of the diazo- and azo-components can be effected by means of a gaseous alkali, for instance ammonia, which permits the development of the picture without having to use any liquid.

"It has been proposed to use an acid for preventing a premature coupling of the components during their storage. Thus it is possible to apply diazo compounds of different kind together with azo components. If diazo compounds other than diazo-anhydrides are chosen, it is necessary to add thereto a considerable quantity of an acid, for instance sulphuric acid, in order to prevent a premature coupling of the components, but this addition impairs considerably the durability of the paper-fibre. Moreover the simple diazo compounds involve the disadvantage that they are scarcely colored so that it is very

difficult to see when the bleaching is finished.

"Now we have found that there can be obtained papers which are equally durable or nearly as durable and capable of being stored as those described in U. S. Patent No. 1,444,469 without having to add a considerable quantity of an acid, by using as diazo components compounds which may be regarded as diazo anhydrides in a broad sense and which may be presumed to have been produced from diazonium compounds with elimination of water. We prefer to use diazo compounds formed from amino compounds containing at least one other amino group substituted or not.

"These diazo compounds possess, like the diazo anhydrides already mentioned, the necessary stability and they are also more or less colored.

"As such diazo components there may be used amino-diazo compounds, for instance the diazo compounds from p-diamines and derivatives thereof and also aminodiphenylamines such, for instance as phenyliminoquinonediazide (comp. Hantzsch & Reddelin, 'Die Diazoverbindungen' Berlin 1921, page 60 ff.), dialkylamino-o-aniline and its sulphonic acid.

"For our new process there may also be used the diazo compounds obtained from aminocarbazoles, being also amino compounds, in which one of the amino groups is substituted by carbon atoms standing in a closed nucleus, aminofluorene, aminodiphenyleneoxide and similar stable diazo bodies, which are also colored and behave in a like manner."

The "16" patent states that, as described in the "14" patent, metallic salts may simultaneously be added to the light-sensitive layer and that instead of incorporating the metallic salts into the light-sensitive layer there may also be used the metal compounds of the diazo- or azo-components in question or of both components in case they contain salt-forming groups, or, when combined with metal salts, form double salts. The patent specification further states that the diazo-anhydrides claimed in the "14" patent are excluded from what is claimed in the application for patent "16". The "16" patent then designates six specific examples of amino-diazo compounds and azo dyestuff components which may be used to carry out the invention. The patent claims the use of "diazo compounds formed from amino compounds containing at least one other amino group"

in both one and two component papers, although the claims 1, 2, 4 and 7 in suit are all directed to two component papers and the use therein of "diazo compounds formed from amino compounds containing at least one other amino group".

The defendant makes a diazo type paper. It uses the double metal salt of a diazo compound formed from an amino compound containing at least one other amino group, an azo dyestuff component and a very considerable quantity of acid, to-wit: citric or tartaric acid. Defendant urges invalidity of the "16" patent upon the ground that the claimed invention thereof consists merely in the substitution of known diazo-anhydrides disclosed by the "14" patent and the prior art and that the advantages resulting from the use of the substances enumerated in the "16" patent are due to the fact that these substances possess the anhydride or quinonoid structure (See Exhibits 28, 29, 30) which is inherent in the substances claimed in the "14" patent. Defendant insists that the advantages of the patent can be obtained only if diazo compounds are employed in which this anhydride or quinonoid structure is found, and if this structure is not found the compounds are not suitable; that the claims are broad enough to include substances which do not have this structure and consequently claim the simple diazo compounds, and that they are therefore invalid.

Plaintiffs' evidence is to the effect that the characteristic properties of the diazo-anhydrides covered by both the "14" and the "16" patents which make them peculiarly suitable for the manufacture of diazo type papers are that they have a chromophore group which gives color and which bleaches out under light to produce a colorless compound thereby leaving the background of the picture practically the color of the original paper,—and slow coupling in comparison with the straight diazonium compounds not having the quinonoid structure. The additional advantage claimed for the amino compounds described in the "16" patent is the wide variety of colors obtainable, resulting from the fact that with the anhydride type of compound the color obtained is usually red or reddish brown, whereas with the amino compounds blues, blacks and dark browns are also obtainable. It appears, however, that the variety of darker colors is largely the result of the addition of various

metal salts and that the disclosure of their use for that purpose was not peculiar to the "16" patent but was disclosed by the previous "14" patent. Some control of colors is also obtainable by selection of diazo coupling components or by the use of a different diazo compound with the same coupling compound depending largely upon results of experimentation.

Plaintiffs' expert testified that there is no distinction in meaning between "amino-diazo" compounds as used in line 56, page 1 of the "16" patent, and the language of the claims "a diazo compound formed from amino compounds containing at least one other amino group". He also recognized the fact that there are very many amino-diazo compounds which do not have the anhydride or quinonoid structure.

The record fairly discloses that unless a diazo compound formed from an amino compound containing at least one other amino group has also the quinonoid or anhydride structure, it is not suitable for use in diazo type prints. The claims relied upon as written are broad enough to include substances which do not have the anhydride or quinonoid structure and plaintiff here contends for a construction of each of the claims in suit to include this element as a limitation in scope.

██ Omitting discussion of defenses of noninfringement and others which may be meritorious, the court is of opinion that the "16" patent must be held invalid because, being for an improvement, the specifications and claims construed together fail to point out particularly and to claim distinctly, in compliance with R.S. sec. 4888, 35 U.S.C. sec. 33, 35 U.S.C.A. § 33, the improvement claimed to constitute the invention. It has long been recognized that in such patents the patentee must clearly distinguish the new from the old and confine his claims to such matter as is new. The precise object of a patent claim is to secure to the inventor all the monopoly to which he is entitled as well as to inform the public what is still open to it. It was held many years ago that the specifications must disclose the secret and contain nothing defective or misleading. See Page v. Ferry, C.C.Mich.1857, Fed.Cas. No. 10,662; Westinghouse Electric & Mfg. Co. v. Quackenbush, 6 Cir., 53 F.2d 632; Bettendorf Co. v. Ohio Steel Foundry Co., 6 Cir., 56 F.2d 777; Permutit Co. v. Graver Corp., 284 U.S. 52, 52 S.Ct. 53, 76 L.Ed. 163; A. O. Smith Corp. v. Petroleum Iron Works Co., 6 Cir., 73 F.2d 531; Dyer v. Sound Studios of New York, 3 Cir., 85 F.2d 431; Sun Ray Gas Corp. v. Bellows-Claude Neon Co., 6 Cir., 49 F.2d 886; Vacuum Oil Co. v. Grabler Mfg. Co., 6 Cir., 62 F. 2d 54.

The fourth and fifth paragraphs of the specifications of the "16" patent lead unmistakably to the belief that the fundamental object of the patent is to teach a process for production of and to produce a paper equally or nearly as durable and as capable of being stored as that described in the "14" patent, without having to add a considerable quantity of acid, and that this could be accomplished by using as diazo components compounds which might be regarded as diazo-anhydrides, using in preference those diazo compounds formed from amino compounds containing at least one other amino group. The advantages claimed were the stability of these diazo compounds and, to some extent, the fact that they are "more or less colored". The reference to sulphuric acid and its effect in impairing the durability of the paper fibre clearly induces the belief that patentees had taught as the principal inventive concept how to eliminate the use of this destructive acid in the production of diazo type papers and that less acid was needed if the amino-diazo compounds disclosed in the patent were used. The record is devoid of proof of any such practical result. Obviously, if the papers are to be stored, as they must be in usual commercial practice, considerable quantities of acid must still be used to prevent premature coupling. The patent clearly implies that less sulphuric acid would be used in the product described in the patent and not that a different acid could be used. There is no evidence that sulphuric acid in any amount ever has been or could be used for the purpose. No reference to acid of any kind or in any amount is contained in the claims.

The confusion in statement of inventive concept in making the application is further apparent from the fact that contrary to the claim as finally allowed, diazo compounds were suggested therein which were not formed from amino compounds containing at least one other amino group. These were eliminated during the prosecution of the application. On lines 64 to 72 of page 1 of the patent, there are suggested three suitable sources of diazo compounds for use in the alleged new process. The first of these, viz., aminocarbazoles, was sufficiently

disclosed by Ruff and Stein, while the other two are outside the classification adopted by the amendment in the claims here in suit. Ruff and Stein in their article (No. 19 of Exhibit H) point out that the diazo of aminocarbazol has excellent light-sensitive properties and that it is fairly stable; that the double metal salts of this compound are very stable; and that the diazo carbazol bleaches to a white background and has a variety of colors.

■ It should be noted that improvements and advancements in the art first distinctly claimed and particularly pointed out by plaintiffs upon the trial but not disclosed in the specifications or claims of the patent cannot avail plaintiffs to remedy obscurities. Plaintiffs now assert that when the "diazo compound being formed from amino compounds containing at least one other amino group" was employed in the claims in issue, it was intended to cover only those amino-diazo compounds having the anhydride or quinonoidal structure. Such narrowing of the plain wording of the claims would result in violation of sec. 4888 of R.S., especially where the record establishes that a fair construction of the claims as written includes inoperative compounds.

■ The principle which permits the interpretation of claims in the light of the specifications does not permit the addition to claims of essential elements, either purposely or carelessly omitted. The plain wording of the classification in the claims in suit forbids the inclusion of limitation to the anhydride or quinonoidal structure. See Permutit Co. v. Graver Corp., 284 U.S. 52, 59, 60, 52 S.Ct. 53, 76 L.Ed. 163; Cochrane v. Badische Anilin & Soda Fabrik, 111 U.S. 293, 4 S.Ct. 455, 28 L.Ed. 433; Stelos Co. v. Hosiery Motor-Mend Corp., 295 U.S. 237, 55 S.Ct. 746, 79 L.Ed. 1414.

■ It is further to be observed that there is no quality which runs through the whole class of diazo compounds formed from amino group containing one other amino group that makes them all suitable for the purpose. A patentee may not designate a few substances out of a large class and claim the class because the public would not be informed therefrom what was excluded from the monopoly. Such a disclosure leaves to the interested public the necessity of experimentation to ascertain what is included in the patent and what is not. Claims based upon such faulty disclosures have frequently been held invalid with reference to chemical inventions as well as other discoveries. See Tyler v. Boston, 7 Wall. 327, 74 U.S. 327, 19 L.Ed. 93; Treibacher-Chemische Werke, etc. v. Roessler & H. C. Co., 2 Cir., 219 F. 210; Matheson v. Campbell, 2 Cir., 78 F. 910; Rickard v. Du Bon, C.C., 97 F. 96; Metals Recovery Co. v. Anaconda Copper Min. Co., 9 Cir., 31 F.2d 100.

In the application as originally filed, the specifications listed substances which were suitable but no classification was disclosed. In the classification adopted upon amendment of the claims, certain of these listed substances were not within its scope. A more limited classification is now being urged. As to both classifications, namely, that included by amendment and the limitation thereof now suggested, it is true that there is nothing in the patent application that points out that either classification has the requisite qualities running through it as a class. The inadequacies of such classifications are discussed in Corona Cord Tire Co. v. Dovan Corp., 276 U.S. 358, 385, 48 S.Ct. 380, 72 L.Ed. 610.

While it may be true, as testified by plaintiffs' expert, that an organic chemist, knowing the differences between the quinonoid compounds, would not be led immediately to the idea that he could replace the diazo-anhydride of the "14" patent with an amino diazo-anhydride, it is altogether likely that one skilled in the art of producing diazo type papers and familiar with the teachings of the "14" patent and of the Ruff and Stein article would encounter no substantial difficulty in making the replacement. Ruff and Stein clearly show the necessity of an alkaline medium for coupling and refer to the excellent light sensitiveness of the diazo of aminocarbazol. In view of the prior disclosures, the court is unable to conclude as urged by plaintiffs that a chemist skilled in the art of production of diazo type papers could not have foretold that the amino-diazo compounds would possess the desired light-sensitiveness, stability, bleaching property, and variety of colors.

For these reasons, the "16" patent is found to be invalid.

The "18" patent is directed to the use of certain substances, and specifically thiourea, in the light-sensitive layer to prevent discoloration of the light background when exposed to the ammonia developer. It appears that when the diazo compounds on the paper are decomposed by exposure to light they produce a derivative of benzene

known as phenols. The yellow stains resulting are not sufficient to obliterate the copy but are undesirable. The patentees claim the discovery that the initial lightness of background can be retained by adding thiourea to the light-sensitive coating of the papers. Defendant admits the presence of thiourea in its products but claims that it is the result of some unexplained catalytic action resulting from the addition of certain anti-oxygene substances.

Defendant relies for its defense of invalidity upon U. S. patent to Vander Grinten, et al., No. 1,821,281. In that patent it is stated:

"The invention is based on the observation that the discoloration of the background in all kinds of diazotype processes can be prevented even for extended periods if a reducing agent is added to the sensitive layer, or during or after development of the picture.

"Preferred reducing agents are organic substances such as aldehydes, amino compounds, aliphatic amido-compounds, poly-oxy-compounds or the like, and the reducing agents are preferably used together with very small quantities of the substances with catalytic action defined as 'anti-oxygenes' by Moureu (Chemisch Zentrallblatt 1922 I 1317; Comptes Rendus 174 pages 258–264 and following).

"If the reducing agents are added to the sensitive layers together with the other constituents the additional advantage is obtained that the small discolouring effect due to the oxidation of the components of the layer which may occur during long storage of it in the unexposed state is also prevented."

From the foregoing, it is clear that Vander Grinten discloses the use of anti-oxygenes in diazo type papers and prints according to Moureu. In one of Moureu's articles, he points out that thiourea is an anti-oxygene of quite general application and is effective in concentrations of one part to one hundred. The record makes clear that the action of the thiourea of the patent in suit is purely an inhibition of the oxidation of the phenols. In view of this disclosure, the court finds that the "18" patent discloses no invention over Vander Grinten.

The foregoing opinion is adopted by the court as its findings of fact and conclusions of law and is hereby made a part of the record.

A decree in conformity herewith may be presented for signature on or before September 1, 1937.